**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF TEXAS**

**LUFKIN DIVISION**

| | |
|---|---|
| R.F., an individual,<br><br>Plaintiff,<br><br>v.<br><br>G6 HOSPITALITY, LLC;<br>G6 HOSPITALITY IP, LLC;<br>G6 HOSPITALITY PROPERTY, LLC;<br>G6 HOSPITALITY PURCHASING, LLC;<br>G6 HOSPITALITY FRANCHISING, LLC;<br>MOTEL 6 OPERATING, L.P.; and<br>VARKINGS HOTELS INC<br>d/b/a MOTEL 6 MERCED,<br><br>Defendants. | Civil Action No.: _______________<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR DAMAGES**

COMES NOW Plaintiff R.F., by and through the undersigned counsel, and respectfully submits her Complaint for damages and makes the following averments.

**INTRODUCTION**

1. This is a civil action for damages brought pursuant to the Federal William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 18 U.S.C. § 1595.

2. Plaintiff meets the definition of a sex trafficking victim as she was induced by force, fraud, and coercion to engage in commercial sex acts at the Motel 6 located at 1410 V Street, Merced, California 95340 (the "Subject Hotel"), in 2016 through and inclusive of 2018.

3. Defendants G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. (collectively, the "G6 Defendants" or "Franchisor Defendants") are the franchisors of the Motel 6 brand. Upon information and belief, they owned, operated or co-operated, controlled, and/or managed the Motel 6 brand and the franchising system through which the Subject Hotel operated throughout the period during which Plaintiff was trafficked.

4. Defendant Varkings Hotels Inc (the "Franchisee Defendant") is the franchisee of the Subject Hotel. Upon information and belief, the Franchisee Defendant owned, operated, or co-operated, controlled, and/or managed the Motel 6 Merced located in Merced, California through the G6 franchising system, and owned and/or operated the Subject Hotel throughout the period during which Plaintiff was trafficked.

5. Section 1591 of the TVPRA criminalizes sex trafficking of adults by force, fraud or coercion. See 18 U.S.C. § 1591. Separately, § 1595 of the TVPRA provides individuals who are victims of sex trafficking with a civil remedy against the traffickers or the beneficiaries of the sex trafficking crime. See 18 U.S.C. § 1595(a). More specifically, § 1595 provides for three distinct causes of action: (1) a claim against the trafficker who directly violated § 1591(a)(1), a criminal statute; (2) a beneficiary claim against the trafficker who directly violated § 1591(a)(2), a criminal statute; and (3) a beneficiary claim against a civil defendant benefiting from and receiving anything of value from participation in a venture which that person knew or should have known was engaged in sex

trafficking. The subject lawsuit is applicable, in part, to prong three, i.e., a beneficiary claim against civil defendants.

## PARTIES

6. Due to the sensitive, private, and potentially retaliatory nature of the allegations herein, Plaintiff proceeds by her initials to protect the privacy and identity of this subject sex trafficked victim. Nationwide similarly situated Plaintiffs have proceeded by pseudonym or by their initials due to the foregoing.

7. Plaintiff R.F. is a resident of California.

8. Defendant G6 Hospitality, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

9. Defendant G6 Hospitality IP, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

10. Defendant G6 Hospitality Property, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

11. Defendant G6 Hospitality Purchasing, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

12. Defendant G6 Hospitality Franchising, LLC is a for-profit Delaware limited liability company with its principal place of business in Carrollton, Texas.

13. Defendant Motel 6 Operating, L.P. is a for-profit Delaware limited partnership with its principal place of business in Carrollton, Texas.

14. Defendant Varkings Hotels Inc, upon information and belief doing business as Motel 6 Merced, is a for-profit California corporation with its principal place of business located at 1410 V Street, Merced, California 95340. Upon information and belief, said Defendant owned, operated,

controlled, and/or managed the Subject Hotel located in Merced, California through the G6 franchising system during the period in which Plaintiff was trafficked, in 2016 through and inclusive of 2018.

## JURISDICTION AND VENUE

15. This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim — including the franchising venture between Franchisee Defendant and the G6 Defendants pursuant to which the Subject Hotel was operated, branded, and controlled — occurred, in substantial part, in Texas and in the Eastern District of Texas.

17. G6 Hospitality, LLC, G6 Hospitality IP, LLC, G6 Hospitality Property, LLC, G6 Hospitality Purchasing, LLC, G6 Hospitality Franchising, LLC, and Motel 6 Operating, L.P. have the same principal place of business, which is in Carrollton, Texas, within the Eastern District of Texas. Each of the G6 Defendants is therefore a resident of the Eastern District of Texas.

18. Venue is also proper as to the G6 Defendants pursuant to 28 U.S.C. § 1391(b)(1) because each of the G6 Defendants maintains their principal place of business in the Eastern District of Texas.

19. The franchising venture pursuant to which Franchisee Defendant operated the subject motel occurred, in substantial part, in Texas because:

(a) upon information and belief, Franchisee Defendant actively sought out a franchising relationship by contacting the G6 Defendants in Texas;

(b) on information and belief, Franchisee Defendant acknowledged that the negotiation, execution, and acceptance of the franchising agreements occurred in the Eastern District of Texas;

(c) on information and belief, Franchisee Defendant agreed that its ongoing performance of the franchising agreement would take place, in part, in the Eastern District of Texas;

(d) on information and belief, the franchising agreements had a choice of law provision selecting the law of Texas as the governing law;

(e) on information and belief, the franchising agreements required Franchisee Defendant to report information to the G6 Defendants in Texas, including information about all incidents involving safety, security, public relations, or serious injuries to persons or property that occur at, or involve, the subject motel, including those involving sex trafficking victims like R.F.;

(f) on information and belief, Franchisee Defendant agreed to submit all notices required under the franchising agreement to the G6 Defendants in the Eastern District of Texas;

(g) on information and belief, Franchisee Defendant was required to attend training and meetings in Texas;

(h) the G6 Defendants dictated policies related to safety, security, human trafficking, and hotel operations at the subject motel from their principal place of business in the Eastern District of Texas;

(i) on information and belief, Franchisee Defendant had an ongoing obligation to participate in centralized programs operated by the G6 Defendants from their principal place of business in the Eastern District of Texas;

(j) on information and belief, Franchisee Defendant was required to purchase insurance on behalf of one or more Texas entities (the G6 Defendants);

(k) upon information and belief, reservation information for rooms at the subject motel passed through a system operated and managed by G6 from its principal place of business in Texas;

(l) upon information and belief, payment information for rooms at the subject motel passed through a system operated and managed by Franchisor in Texas;

(m) on information and belief, the benefit that Franchisee Defendant received from room rentals was governed by the Texas franchising agreement;

(n) on information and belief, Franchisee Defendant agreed to make all payments due under the franchising agreement at the G6 principal place of business in the Eastern District of Texas;

(o) the day-to-day operations of the subject motel were dictated, controlled, and influenced by many policies set and enforced by the G6 Defendants from their principal place of business in Carrollton, Texas;

(p) on information and belief, Franchisee Defendant signed a software licensing agreement with the G6 Defendants for the property management software the G6 Defendants required Franchisee Defendant to use when operating the subject motel, including, but not limited to, when booking rooms at the hotel and processing payment for those rooms; and

(q) on information and belief, Franchisee Defendant agreed to file any lawsuit arising from the licensing agreement in the Eastern District of Texas and waived personal jurisdiction and venue objections.

## FACTS

### I. R.F. was a Victim of Unlawful Sex Trafficking at the Subject Hotel Owned, Operated, Managed, and Controlled by Defendants.

20. In 2016 through and inclusive of 2018, Plaintiff R.F. was trafficked at the Subject Hotel by her trafficker. Under the control of her trafficker, R.F. was induced by force, fraud, and coercion to engage in commercial sex acts at the Subject Hotel.

21. Plaintiff was trafficked by her trafficker, a male individual known to Plaintiff as "Papi Lop," who operated a commercial sex trafficking enterprise at the Subject Hotel.

22. In addition to sex trafficking, the trafficker was engaged in selling and distributing controlled substances, including cocaine and marijuana, on the subject premises and out of the rooms used for the trafficking.

23. In order to induce R.F. by force, fraud, and coercion to engage in sex with sex buyers at the Subject Hotel:

(a) the trafficker physically abused and assaulted R.F., including by grabbing her by the hair and violently dragging her back into the room used for the trafficking, in the presence and plain view of housekeeping staff of the Subject Hotel, and leaving visible signs of physical abuse on her body;

(b) the trafficker threatened R.F. with harm; the trafficker possessed a firearm;

(c) the trafficker, at times, confiscated and retained R.F.'s personal belongings, including her identification;

(d) the trafficker instilled in R.F. the fear that she would suffer serious harm if his demands were not complied with;

(e) psychological coercion; and

(f) other means of force, fraud, and coercion used by the trafficker to induce her to have sex with sex buyers at the Subject Hotel.

24. R.F. was compelled to engage in commercial sex acts with many numerous sex buyers per day at the Subject Hotel.

25. At the direction and under the control of her trafficker, Plaintiff was caused to solicit commercial sex in and around the Subject Hotel premises, dressed in lingerie and other sexually provocative and revealing clothing, in open and plain view of hotel staff and the public. Plaintiff was also advertised by her trafficker for commercial sex acts online, including on Backpage.com and, upon information and belief, other online platforms.

26. In 2016 through and inclusive of 2018, R.F. was trafficked at the Motel 6 located at 1410 V Street, Merced, California 95340.

27. The physical, behavioral, and psychological effects of sex trafficking on its victims are well-recognized in the hospitality industry. These effects were obvious and apparent to the staff and management of the Subject Hotel including effects on R.F.'s appearance, demeanor, movements throughout the hotel, her visible signs of physical abuse, her sexually provocative attire, and her interactions with her trafficker, hotel staff, and others. Observing these effects provided Defendants with notice that R.F. was being continually subjected to coercion, control, and exploitation.

28. Upon information and belief, the trafficker was assisted in the operation of his commercial sex trafficking enterprise by another woman under his control, who maintained a separate room at the Subject Hotel used in connection with the venture.

## II. Sex Trafficking in the Hotel Industry Is a Well-Known and Pervasive Problem.

30. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Franchisor Defendants and Franchisee Defendant knew or should have known regarding the trafficking at the Subject Hotel, including the trafficking of R.F.

31. Sex slavery is pervasive in the United States, and hotels are the primary place where it happens. For years, sex traffickers have been able to reap their profits with little risk when operating within hotels. In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.

32. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

35. The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff.

36. Toolkits specific to the hotel industry have been developed which help hotel staff in every position identify and respond to signs of sex trafficking. From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

37. The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion. It is also well established that prostitution and sex trafficking share a common denominator, the exchange of sex for money. The

definition of sex trafficking in the TVPRA under 18 U.S.C. § 1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex activity in their hotels were in fact signs of sex trafficking.

38. All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing the Subject Hotel, when enacting and enforcing policies and procedures applicable to the Subject Hotel and when training, educating, and supervising the staff of the Subject Hotel.

39. The most effective weapon against sexual exploitation and human trafficking is education and training. The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Hotel employees who have undergone training are more aware of trafficking when it happens and are more willing to report it than those who have not been trained. If hotel companies do nothing to raise awareness or to prevent trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place.

40. Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels is a decision to continue generating revenue while failing to take reasonable steps to identify and prevent sex trafficking.

41. Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train hotel staff to identify and respond to the signs of sex trafficking.

## III. Sex Trafficking Has Long Been Prevalent at G6 Branded Properties, and Defendants Have Known About It.

42. Defendants have long been on notice of the pervasive problem of sex trafficking in the hotel industry. On information and belief, each of the Defendants has also long been on notice of sex trafficking occurring at Motel 6 properties including the Subject Hotel.

43. G6 branded properties include both Motel 6 and Studio 6 properties.

44. Use of G6 branded properties for sex trafficking is well known to the G6 Defendants. Motel 6 hotels are one of the five chains most frequently identified as a site of sex trafficking in federal criminal complaints.

45. A Los Angeles Motel 6 became such a hub for human trafficking and other criminal activity that the G6 Defendants paid to settle a public nuisance lawsuit filed by the City of Los Angeles. G6 Defendants knew staff at its branded properties were facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at G6 brand properties.

46. The settlement required the G6 Defendants to change policies that were facilitating sex trafficking. Based on information and belief, G6 has failed to adequately implement and enforce such changes.

47. Motel 6 properties are frequently located near major roadways and interstate highways, making them attractive venues for trafficking and compelled prostitution. The Subject Hotel is itself located on V Street in Merced, California, in close proximity to State Route 99, a major highway corridor through California’s Central Valley.

48. Numerous publicized incidents demonstrate the use of G6 branded hotels for sex trafficking and establish that Defendants knew, or should have known, of the use of G6 branded hotels for

sex trafficking. Among notable incidents involving the use of Motel and Studio 6 hotels for sex trafficking: in late 2003, a trafficker operated a sex trafficking venture at a Motel 6 in Connecticut; in April 2009, a sex trafficking venture operated out of a Motel 6 in Toledo, Ohio; in approximately September 2011, sex traffickers sold minors for sex at a Motel 6 in Toledo, Ohio; from approximately 2012 through October 2014, two men engaged in criminal sex trafficking of children at a Motel 6 in Harvey, Illinois; in December 2012, the FBI investigated human trafficking at a Motel 6 in Madison, Alabama; in December 2012, the Orange County Human Trafficking Task Force busted a criminal enterprise selling women for sex out of a Motel 6 in Anaheim, California; in March 2014, a trafficker was charged with selling a seventeen year old girl for sex at a Motel 6 in Roseville, Minnesota; in March 2015, a seventeen year old girl was rescued from a Motel 6 in North Charleston, South Carolina by DHS special agents after being sold for sex, beaten, and starved; in March 2015, two men were arrested for sex trafficking a fifteen year old girl at a Motel 6 in Austin, Texas; over a fourteen month period ending in approximately April 2015, a Motel 6 in Warwick, Rhode Island had seventy-five arrests for crimes including sex trafficking; and in June 2015, a married couple was indicted for sex trafficking minor children out of a Motel 6 in Everett, Washington.

## IV. Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel.

49. G6 Defendants were specifically aware that sex trafficking was widespread, in general, and knew, or should have known that same was occurring at the Subject Hotel during and prior to the time that Plaintiff was trafficked there.

50. Upon information and belief, Defendants knew or should have known about the widespread trafficking at the Subject Hotel based on:

(a) the obligation of hotel staff and hotel management to report suspected criminal activity including sex trafficking to the G6 Defendants;

(b) law enforcement activity at the Subject Hotel, including, upon information and belief, the 2018 law enforcement response to the subject premises during which R.F.'s trafficker was arrested on narcotics and firearm charges;

(c) the fact that hotel staff observed the obvious signs of the trafficking of Plaintiff, including the trafficker's open violence against her; and

(d) other sources of information available to Defendants.

51. All knowledge from the staff at the Subject Hotel is imputed to G6.

## V. Defendants knew R.F. was being trafficked at the Subject Hotel because of the obvious signs of her trafficking.

52. During the period that R.F. was trafficked at the Subject Hotel, there were signs obvious to hotel staff and management that she was being trafficked, including:

(a) Steady foot traffic of sex buyers to and from the rooms rented for the trafficking of R.F., with numerous sex buyers per day;

(b) Large numbers of male sex buyers asking for R.F. or her trafficker at the front desk of the Subject Hotel;

(c) R.F. was caused to solicit commercial sex in and around the Subject Hotel premises, dressed in lingerie and other sexually provocative and revealing clothing, in open and plain view of hotel staff and the public;

(d) R.F. was regularly seen by hotel staff in and about the Subject Hotel with visible signs of physical abuse on her body;

(e) The trafficker grabbed R.F. by the hair and violently dragged her back into the room used for the trafficking, in the presence and plain view of housekeeping staff of the Subject Hotel;

(f) Housekeeping staff entered and cleaned the rooms used for the trafficking approximately every two days, and observed or should have observed suspicious items inside the rooms, including condoms and lingerie;

(g) The trafficker was openly and notoriously present on the subject premises, operating a drug distribution operation involving cocaine and marijuana out of the hotel rooms in a manner observable to hotel staff;

=(i) Upon information and belief, another woman under the trafficker's control who assisted in the operation of the venture maintained a separate room at the Subject Hotel;

(j) Plaintiff was advertised by her trafficker for commercial sex acts online, including on Backpage.com, upon information and belief using internet/Wi-Fi available at the Subject Hotel;

(k) Upon information and belief, in 2018 law enforcement responded to the Subject Hotel at approximately 3:00 a.m. and arrested the trafficker on the subject premises on charges including narcotics and firearm offenses;

(l) Upon information and belief, hotel staff observed the foregoing red flags, yet took no action to stop the trafficking, report it, or intervene; and

(m) Other commonly known sex trafficking red flags which Defendants knew or should have known of had anti-trafficking measures been timely and properly implemented at the hotel.

53. Hotel staff and management observed, or should have observed, the foregoing obvious signs of sex trafficking including items set forth in the preceding paragraph.

54. When being trafficked at the Subject Hotel in 2016 through and inclusive of 2018, R.F. was aware that staff of the Subject Hotel observed R.F., her trafficker, as well as a frequent procession of sex buyers going in and out of the subject rented rooms, contemporaneous with other signs and indicators of trafficking occurring on the subject premises.

55. R.F. knows that some of the individuals that witnessed and observed red flags indicative of sex trafficking were staff members in that the staff were readily identifiable to R.F. either by her knowing of the individual and/or by means of the staff wardrobe/nametag/hotel logo and/or by means of a staff member being in an employee restricted area and/or by means of a staff member being stationed at the front desk of the Subject Hotel. In particular, housekeeping staff of the Subject Hotel, who cleaned the rooms used for the trafficking approximately every two days, directly witnessed the trafficker's violence against R.F., or should have observed same.

56. Based upon information and belief, multiple employees at the Subject Hotel, including management-level employees and front desk and housekeeping staff, observed, or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

57. As such, Defendants knew or should have known that R.F. was being trafficked at the Subject Hotel.

58. The foregoing red flags were not merely indicators of commercial sex activity but were indicators of sex trafficking specifically because they included observable signs of force, coercion, and control over R.F. — including the trafficker grabbing her by the hair and violently dragging her back into the room in the presence of housekeeping staff, the visible signs of physical abuse

on her body, and her being caused to solicit commercial sex in and around the premises under her trafficker's direction and control. These signs, individually and collectively, provided Defendants with notice not only of sex trafficking activity generally at the Subject Hotel, but specifically that R.F. was being subjected to trafficking through force, fraud, and coercion.

## VI. Defendants actively facilitated sex trafficking at the Subject Hotel, including the trafficking of R.F.

59. Defendants had both actual and constructive knowledge of the trafficking of R.F. at the Subject Hotel because the trafficking was, in part, a consequence of Defendants facilitating her trafficking at the Subject Hotel.

60. The rooms used for the trafficking of R.F. were rented and/or renewed on a repeated, day-by-day basis and for extended stays, in 2016 through and inclusive of 2018.

61. Defendants rented rooms to individuals it knew or should have known were engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA.

62. Franchisee Defendant, through its staff, rented rooms used for the trafficking of R.F., collected payment for those rooms, and interacted face-to-face with R.F. and her trafficker on a regular and repeated basis — including fielding inquiries from male sex buyers asking for R.F. or her trafficker at the front desk. These were not passive observations of trafficking from a distance; Franchisee Defendant was involved in the commercial transactions that provided the venue for the trafficking of R.F.

63. Defendants knowingly benefited from the sex trafficking of Plaintiff at the subject hotel by receiving payment for the rooms rented that were used for sex trafficking, including as to the Plaintiff, in violation of the TVPRA in 2016 through and inclusive of 2018.

64. Discovery will reveal facts concerning the manner in which the trafficker and those acting at his direction booked rooms at the subject hotel that were used for the sex trafficking of the Plaintiff in violation of the TVPRA:

(a) the identity and name under which each room was booked or renewed;

(b) whether cash, prepaid card, debit card or credit card was used at the time of respective booking or renewal; and

(c) whether staff of Defendants required for each booking that the renter show their identification.

65. Defendants allowed the trafficker and those acting at his direction on the subject premises to continue to pay for rooms rented at the subject hotel during the time that Plaintiff was being sex trafficked there in violation of the TVPRA.

66. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking in general and, on information and belief, at the Subject Hotel, Franchisee Defendant continued renting rooms used to sexually exploit Plaintiff.

67. Franchisee Defendant knew or should have known that R.F. was being trafficked and, despite this, benefited from continued association with her trafficker by providing a venue for her exploitation.

68. Franchisee Defendant also facilitated trafficking at the Subject Hotel, including the trafficking of R.F., in ways including:

(a) allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

(b) inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

(c) choosing not to report known or suspected criminal activity including sex trafficking according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures, notwithstanding that its own housekeeping staff directly witnessed the trafficker's violence against R.F.; and

(d) creating an environment where the trafficker did not need to incur the burden of taking significant steps to conceal his activities but, instead, could operate openly — including committing open acts of violence against R.F. in front of staff — without concern for detection or interference by the hotel staff.

69. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of R.F.

70. Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Subject Hotel, G6 continued renting rooms used to sexually exploit victims, including R.F.

71. G6 knew or should have known that R.F. was being trafficked and, despite this, benefited from continued association with her trafficker by providing hotel rooms and related services used for her exploitation.

72. Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Subject Hotel, the G6 Defendants continued participating in a venture at the Subject Hotel, with Franchisee Defendant and hotel staff, in a way that they knew or should have known would lead to additional sex trafficking, including but not limited to by the following:

(a) the G6 Defendants adopted inappropriate and inadequate practices for selecting, training, supervising, managing, and disciplining franchisees and hotel staff regarding issues related to human trafficking;

(b) the G6 Defendants provided inadequate training on issues related to human trafficking and unreasonably delayed providing training;

(c) the G6 Defendants adopted a safety and security budget and safety and security practices that were clearly insufficient considering the known problem of sex trafficking at Motel 6 properties;

(d) the G6 Defendants failed to ensure that franchisees and hotel staff reported or responded to criminal activity including sex trafficking appropriately;

(e) the G6 Defendants continued to use policies, protocols, and practices that had been shown to lead to widespread trafficking at G6 branded properties, including the Subject Hotel;

(f) the G6 Defendants attracted traffickers by maintaining a venue where access was easy, risks of interference were low, and traceability was minimal;

(g) the G6 Defendants allowed traffickers to reserve and pay for rooms using cash, on a day-by-day basis, which provided relative anonymity and non-traceability; and

(h) the G6 Defendants provided traffickers with access to internet services in a manner that the G6 Defendants knew or should have known would be used to facilitate trafficking by promoting commercial sex services online.

73. If G6 had exercised reasonable diligence when operating the Subject Hotel and in the areas where it retained control, G6 would have prevented the Subject Hotel from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of R.F. Instead, G6 engaged in a course of conduct that facilitated widespread and ongoing sex trafficking, including the trafficking of R.F.

## VII. Defendants knowingly benefited from participation in a venture that they knew or should have known was engaged in sex trafficking.

74. Through the conduct described above, Defendants knowingly benefited from engaging in a venture with the trafficker and with one another.

76. The repeated rental transactions between the trafficker (and those acting at his direction) and the Subject Hotel which occurred during the time that Plaintiff was trafficked at the subject hotel were colored by overt indicators of sex trafficking — including open violence against R.F. in front of staff, open solicitation on and around the premises, and sex buyers asking for R.F. or her trafficker at the front desk — and open drug distribution such that said Defendant knew, or should have known, that Defendant was renting rooms to, and facilitating, individuals engaged in sex trafficking, and of Plaintiff in particular, in violation of the TVPRA. This continuous business relationship gives rise to the inference of a tacit agreement between the trafficker and the Subject Hotel notwithstanding that the trafficker was engaged in sex trafficking.

77. A venture existed between the trafficker and Franchisee Defendant at the subject hotel premises by means of rooms repeatedly rented for the trafficking, which rooms Defendants knew, or should have known, were being used for the sex trafficking of Plaintiff in violation of the TVPRA, and which the parties wished to continue for profit.

78. A venture also existed between Franchisee Defendant and the G6 Defendants pursuant to which the Subject Hotel was operated, branded, and controlled.

79. Relative to the subject hotel, a continuous business relationship existed between Franchisee Defendant and the trafficker's sex trafficking business, in part, in that Defendant provided assistance, support, or facilitation to the trafficker and individuals it knew or should have known

were involved in sex trafficking on the premises, in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the trafficking venture's success.

80. Relative to the subject hotel, a continuous business relationship existed between Franchisor Defendants and the trafficker's sex trafficking business, in part, in that said Defendants provided assistance, support, or facilitation to the trafficker and individuals they knew or should have known were involved in sex trafficking on the premises in violation of the TVPRA, including as to the Plaintiff herein; and in doing so facilitated the trafficking venture's success.

81. Through the conduct described above, each Defendant also knowingly benefited from engaging in a commercial venture with other Defendants operating the Subject Hotel. Defendants associated with one another and with the hotel staff to operate the Subject Hotel. Each Defendant received financial benefits from operating the Subject Hotel, including revenue generated specifically by renting rooms used for the trafficking. They engaged in revenue sharing and had a common incentive to maximize revenue. By participating in a venture that facilitated sex trafficking, Defendants also benefitted by keeping operating costs low and maintaining the loyalty of the segment of their customer base that seeks to participate in the sex trade.

## VIII. Franchisee Defendant and the Staff at the Subject Hotel Acted as Actual Agents of G6.

82. G6 is vicariously liable for the acts, omissions, and knowledge of Franchisee Defendant and the staff of the Subject Hotel.

83. The G6 Defendants subjected Franchisee Defendant to detailed standards and requirements regarding the operation of the Subject Hotel through the franchising agreements, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the G6 Defendants.

84. The G6 Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the G6 Defendants imposed on the Franchisee Defendant:

(a) did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendant used at the Subject Hotel;

(b) covered virtually all aspects of hotel operations, including internal operating functions;

(c) dictated the specific manner in which Franchisee Defendant and hotel staff must carry out most day-to-day functions at the Subject Hotel; and

(d) significantly exceeded what was necessary for G6 to protect its registered trademarks.

85. In addition to the foregoing, upon information and belief, G6 exercised and reserved the right to exercise control over the day-to-day operation of the Subject Hotel, including:

(a) requiring franchisees and management to participate in mandatory training programs covering all aspects of hotel operations;

(b) controlling training content and methods for hotel staff;

(c) designating approved vendors and prohibiting purchases from non-approved sources;

(d) requiring use of specific technology, hardware, software, and property management systems;

(e) setting required staffing levels;

(f) establishing detailed job descriptions and dictating which positions must perform which tasks;

(g) setting requirements for hiring, overseeing discipline, and termination decisions;

(h) controlling channels for guest complaints and directly participating in responses;

(i) generating reports and analysis of guest complaints and online reviews;

(j) requiring use of a Guest Relations Application owned and operated by G6;

(k) regularly auditing books and records;

(l) conducting frequent and unscheduled inspections;

(m) retaining the right to issue fines, require corrective action plans, and terminate franchising agreements;

(n) controlling all marketing and prohibiting unauthorized online presence; and

(o) imposing detailed recordkeeping and reporting requirements regarding virtually all aspects of hotel operations.

86. Upon information and belief, the G6 Defendants participated directly in aspects of the operation of the Subject Hotel that influenced whether and to what extent trafficking occurred, including:

(a) publicly assuming responsibility and control over the human trafficking response of all Motel 6 and Studio 6 properties;

(b) retaining control over when branded hotels would share information with law enforcement;

(c) creating a reporting hotline for hotel staff and franchisees to report suspected human trafficking and determining when issues should be escalated;

(d) retaining control over determining which hotels needed additional training based on high risk of trafficking;

(e) retaining control to terminate staff or franchising agreements based on the response to human trafficking;

(f) retaining control over all training on how to spot and prevent human trafficking;

(g) maintaining a Safety & Security Team and Critical Incident Rapid Response Team for investigating potential criminal incidents;

(h) adopting, enforcing, and monitoring policies and codes of conduct related to human trafficking; and

(i) maintaining control over internet services at the Subject Hotel, including whether sites used to solicit sex trafficking victims would be accessible.

87. G6 directly participated in and retained day-to-day control over renting rooms at the Subject Hotel by, among other things:

(a) controlling all details of the guest reservation, check-in, and payment processes;

(b) directly making reservations and accepting payment through a central reservation system without requiring franchisee approval;

(c) establishing and maintaining a brand-wide guest rewards and loyalty program;

(d) controlling room rates, required discounts, mandatory fees, and rewards programs;

(e) controlling and restricting the ability of franchisees and staff to refuse or cancel a reservation;

(f) controlling policies and procedures regarding check-in, payment and identity verification;

(g) collecting, retaining, monitoring, and analyzing detailed data about every guest; and

(h) exercising and retaining the right to exercise control over virtually all aspects of room reservations and payment.

## IX. G6 Defendants are jointly responsible for the trafficking of R.F.

88. All the G6 Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

89. Upon information and belief, operation of the Subject Hotel was part of a single unified operation by G6 Defendants. Upon information and belief, all G6 Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos.

## X. Causation.

90. The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to R.F.

91. Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to R.F. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## XI. Tolling of Limitations.

92. Plaintiff was under the control, coercion, and manipulation of her trafficker through in or about August 2018, and as a result, Plaintiff lacked the information and capacity to understand her injuries and their legal causes.

93. Thus, Plaintiff did not discover and could not reasonably have discovered the legal cause of her injury — through no fault of her own — and lacked the information and understanding to bring a claim because she did not know both her injury and the cause of her injury. This lack of

information was a direct result of Plaintiff being kept under the control, coercion, and manipulation of her trafficker, which Defendants facilitated.

94. At the time Plaintiff was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being "trafficked" at Defendants' hotel, or that she was a person "trafficked," much less that she was the "victim" of a legal venture involving Defendants, and she did not discover and was not in a position to discover the legal cause of her injury for years after her trafficking ended.

95. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Plaintiff faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Plaintiff filed this lawsuit.

96. While under the control of her trafficker through in or about August 2018, Plaintiff did not have the freedom to investigate her claims, to identify those responsible, or to seek legal representation necessary to pursue her legal rights. Plaintiff could not have pursued her claims while under the active control of her trafficker despite the exercise of ordinary diligence.

97. To the extent Defendants assert an affirmative defense of limitations, Plaintiff invokes the continuing violation doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct by Defendants.

98. Plaintiff was subject to continuous trafficking at the subject hotel through in or about August 2018, which is not more than 10 years before Plaintiff brings this lawsuit.

99. This continuous trafficking resulted from Defendants' facilitation of trafficking at the subject hotel as described above.

100. The TVPRA's ten-year limitations period, 18 U.S.C. § 1595(c), is subject to equitable tolling. See Arellano v. McDonough, 598 U.S. 1, 6–7 (2023), in which the Court emphasized the "hornbook law" presumption that federal statutes of limitations are subject to tolling unless Congress clearly states otherwise. See also Doe v. G6 Hospitality Franchising LLC et al., No. 3:2025-cv-00770, Document 53 (N.D. Tex. 2025).

**CAUSES OF ACTION — SEX TRAFFICKING UNDER THE TVPRA**

101. R.F. incorporates all other allegations.

**COUNT I. Cause of Action: Beneficiary Liability under § 1595(a) of the TVPRA (all Defendants)**

102. R.F. is a victim of sex trafficking within the meaning of 18 U.S.C. §§ 1591 and 1595(a) and is entitled to bring a civil action against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

103. Through acts and omissions, and participation, described throughout this Complaint, Defendants received a financial benefit from participating in a venture with traffickers, including R.F.'s trafficker, even though Defendants knew or should have known that this trafficker was engaged in violations of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2). Thus, Defendants are liable as a beneficiary under 18 U.S.C. § 1595(a).

104. Through the acts and omissions described throughout this Complaint, G6 Defendants received a financial benefit from participating in a venture with Franchisee Defendant regarding the operations of the Subject Hotel even though G6 Defendants knew or should have known that this venture was violating 18 U.S.C. §§ 1591(a) and 1595(a).

105. Defendants' participation in these ventures combined with the trafficker's conduct, and the other unlawful acts and omissions alleged in this Complaint, to cause R.F. to suffer substantial physical and psychological injuries and other damages because of being trafficked at the Subject Hotel.

**COUNT II. Cause of Action: Vicarious Liability for TVPRA Violations (G6 Defendants)**

106. Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

107. Under the TVPRA and the federal common law, an entity is vicariously liable for the acts and omissions of its alter-egos.

108. Franchisee Defendant acted as the actual agent of G6 Defendants when operating the Subject Hotel.

109. Through the acts and omissions described throughout this Complaint, G6 Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by Franchisee Defendant to operate the Subject Hotel.

110. G6 Defendants are vicariously liable for the TVPRA violations of Franchisee Defendant and the subagents of that franchisee.

## DAMAGES

111. As a direct and proximate result of Defendants' conduct, R.F. has suffered and will continue to suffer substantial damages.

112. Defendants are jointly and severally liable for all past and future damages sustained by R.F.

113. Defendants' failure to timely and properly prevent the sex trafficking or timely intervene regarding same was a proximate cause of the injuries and damages sustained by R.F. in this case

including, but not limited to, being the victim of sex trafficking when at the Subject Hotel and suffering personal injury and the trauma physically and mentally of being induced to engage in commercial sex with multiple sex buyers per day while being trafficked, and while simultaneously being under fear of harm if she did not comply, being subjected to repeated physical abuse and violence — including being grabbed by the hair and violently dragged by her trafficker in front of hotel staff — being under the control of an armed trafficker, having her personal belongings and identification confiscated, and being threatened, as well as all residual injuries suffered by PTSD.

114. R.F. being sex trafficked at the Subject Hotel was a proximate cause, competent cause, and substantial factor in causing her severe and permanent injuries including but not limited to personal injuries including the horror of being a victim of sex trafficking as well as significant levels of psychological trauma due to the levels of abuse she was caused to endure during the time she was trafficked. This trauma led to depression, anxiety disorders, and PTSD, which in turn affects daily functioning.

115. As a direct and proximate result of Defendants' failure to act, mandate, establish, and execute anti-trafficking measures and modify their anti-trafficking efforts at the Subject Hotel, R.F. was sex trafficked, sexually exploited, and victimized repeatedly.

116. As a consequence of being sex trafficked at the Subject Hotel, R.F. suffered and will continue to suffer substantial economic, physical, mental, emotional, psychiatric, and psychological injuries as the result of being trafficked and sexually exploited at the Subject Hotel in violation of 18 U.S.C. § 1591.

117. R.F. is entitled to be compensated for personal injuries and economic damages, including:

(a) Actual damages (until trial and in the future);

(b) Incidental and consequential damages (until trial and in the future);

(c) Mental anguish and emotional distress damages (until trial and in the future);

(d) Lost earnings and lost earning capacity (until trial and in the future);

(e) Necessary medical expenses (until trial and in the future);

(f) Life care expenses (until trial and in the future);

(g) Physical pain and suffering (until trial and in the future);

(h) Physical impairment (until trial and in the future);

(i) Exemplary/Punitive damages;

(j) Attorneys' fees as allowed by law;

(k) Costs of this action; and

(l) Pre-judgment and all other interest recoverable.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as identified in the above-referenced Counts and as follows:

(a) All available compensatory damages for the described losses with respect to the above cause of action;

(b) Past and future emotional distress;

(c) Consequential and/or special damages;

(d) All available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

(e) Physical pain and suffering;

(f) Disgorgement of profits obtained through unjust enrichment;

(g) Restitution;

(h) All damages allowable under the TVPRA;

(i) Attorneys' fees as allowed by law;

(j) Punitive damages with respect to each cause of action;

(k) Costs of this action;

(l) Prejudgment and all other interest recoverable; and

(m) Such other and further relief to which R.F. may, in law or in equity, show herself to be justly entitled.

**DEMAND FOR JURY TRIAL**

Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated: July 7, 2026

Respectfully submitted,

/s/ Jason Byrd

Jason Byrd
THE BYRD LAW FIRM
448 Orleans
Beaumont, TX 77701
Telephone: (409) 924-0660
Facsimile: (409) 924-0035
jason@txbyrd.com

Randolph Janis, Esq.
DOUGLAS AND LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501
rjanis@douglasandlondon.com

Chloe Makowsky, Esq.
DOUGLAS AND LONDON, P.C.
One State Street, 35th Floor
New York, NY 10004
Telephone: (212) 566-7500
Facsimile: (212) 566-7501

cmakowsky@douglasandlondon.com

*Attorneys for Plaintiff*